DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| CAROL M. HINKLE SANCHEZ, Individually and on behalf of her minor children, M.T.H.S. and A.X.H.S., <br><br> Plaintiffs, <br><br> vs. <br><br> TAKECARE INSURANCE COMPANY, Inc., a Guam Corporation, <br><br> Defendant. | Civil Case No. 09-00001 <br><br> **OPINION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

This matter came before the court on October 1, 2010, on the Defendant TakeCare Insurance Company's Motion for Summary Judgment (*see* Docket No. 38). Having considered the parties' arguments and submissions, as well as relevant caselaw and authority, the court hereby **GRANTS** the Defendant's motion and issues the following decision.

**I. FACTUAL BACKGROUND**

The facts appear to be undisputed. Plaintiff Carol M. Hinkle Sanchez ("Plaintiff") was a subscriber to a health insurance policy or plan ("Plan") issued to her then-employer Guam Legal Services Corporation ("GLSC"). The Plan was underwritten by Defendant TakeCare Insurance Company ("TakeCare"), as successor in interest to PacificCare Asia Pacific. *See* Docket No. 39. The Plan was effective June 1, 2005 until June 1, 2006, subject to renewal. The Plan materials consist of three components: (1) the Group Insurance Policy between TakeCare and GLSC; (2) a Medical Schedule of Benefits setting forth specific coverage limitations and exclusions; and (3)

the Member Handbook. *See* Docket No. 41, Declaration of Sasha Pocaigue ("Pocaigue Decl."), at Exhs. A-C.

The Plaintiff became pregnant with twins and consequently identified as having a high-risk pregnancy on or about October 5, 2005, when she had an ultrasound performed. *See* July 29, 2010 Docket No. 41, Pocaigue Decl., Exh. D. Her twin children, identified herein as M.T.H.S. and A.X.H.S. (the "twins"), were born prematurely (27 weeks) on December 7, 2005. The twins were immediately placed in the NeoNatal Intensive Care Unit ("NICU") at Guam Memorial Hospital ("GMH"). The twins required hospitalization for periods of two months and three months, respectively, before being discharged. *See* Docket No. 13, First Amended Compl., ¶ 10.

The Plaintiff duly enrolled her twins as "members" under the Plan on or about December 8, 2005. *See* Docket No. 13, First Amended Compl., ¶ 12. TakeCare accepted both twins as Plan members, and subsequently paid their hospitalization medical bills up to the amount of $50,000 each, for a total of $100,000 for the twins. *See* Docket No. 40, Transcript of Deposition of Plaintiff Carol Hinkle Sanchez (June 2, 2010) ("Hinkle Tr.'), p. 43:7-21; *see also* Docket No. 41, Pocaigue Decl., Exh. B, p. 2. Plaintiff maintains that, at the suggestion of GMH personnel, she telephoned an unnamed TakeCare Customer Service representative sometime in late December, 2005, in order to "follow-up" on the enrollment of the twins. *See* Docket No. 41, Pocaigue Decl., Exh. E. [May 22, 2006 letter, p. 2]. She claims that she explained that her twins were born prematurely and would be hospitalized for an indefinite period. *See* Docket No. 13, First Amended Compl., ¶ 14. She claims further that the TakeCare representative told her that her twins were "**fully covered**." *Id.* (emphasis added).

Commencing on or about March 22, 2006, once the billings for each of the twins exceeded $50,000, TakeCare began sending out letters denying specific submitted invoices based upon the Plan Limitation set forth in the Schedule of Benefits, as follows: "**Plan Limitations – *complication of infancy/Congenital Abnormalities - limited to $50,000 per member/benefit year**." *See* Docket No. 41, Pocaigue Decl., Exh. B, p.2 (emphasis added). The letters stated that such claims were being denied because the patient had "[m]et complications of

NB limit (50k) for benefit year 6/2005 to 5/2006." *Id.*, Exh. F. Plaintiff admitted during her deposition that she did not carefully review the Plan Limitation clause or other Plan provisions until after the birth of the twins. *See* Docket No. 40, Hinkle Tr. 77:9-12 ("I may have saw [sic] it there, but I didn't read it."); pp. 82:16-19.

Upon receipt of these letters, the Plaintiff contacted a member service representative to question the letters, specifically the denial, and requested TakeCare to mail her a copy of the member handbook and policy to which Defendant relied upon in making its decision. *See* Docket No. 13, First Amended Compl., ¶ 20; Docket No. 51, Erratum re Exhibits cited in Declaration of Carol M. Hinkle Sanchez ("Erratum"), Exhs. A and B.

The Plaintiff maintained that under the Schedule of Benefits, newborn care was to be covered 100%. *See* Docket No. 41, Pocaigue Decl., Exh. B, p. 3. In the Schedule of Benefits, the following is provided:

> **Inpatient Hospital Care -** Newborn Care *(if newborn is enrolled within 31 days of birth)* - 100% of eligible charges.
>
> **Plan Limitations -** *Complication of Infancy/Congenital Abnormalities **-** limited to $50,000 per member/benefit year.
>
> * NOTE: This Schedule of Benefits is only a summary. Please refer to the Member Handbook and Provider Directory for a more thorough description of covered benefits.

Docket No. 41, Pocaigue Decl., Exh. B, p. 2. There is no definition or guidance provided in the Schedule of Benefits or Member Handbook as to what constitutes a complication of infancy.

On May 22, 2006, the Plaintiff initiated a "first level review" by sending TakeCare a letter entitled "appeal of denied coverage," which TakeCare received on May 30, 2006, claiming that the denial of claims in excess of $50,000 was erroneous and that she had been assured that her twins would be "fully covered." *See* Docket No. 41, Pocaigue Decl., Exh. E. Under the policy terms, TakeCare had five (5) calendar days to send Plaintiff a letter acknowledging its receipt of her appeal and, as a post-service claim, thirty [30] calendar days from the date TakeCare received the appeal to give a written decision. *Id.*, Exh. C.

On July 6, 2006, the Defendant received TakeCare's response in a letter dated June 28, 2006, rejecting the appeal. *See* Docket No. 41, Pocaigue, Exh. G. TakeCare denied Plaintiff's

appeal because of the Plan Limitation clause of $50,000 per member, per benefit year. On November 22, 2006, Plaintiff initiated a "second-level review" by a letter delivered to TakeCare on that date. *Id.*, Exh. H. Under the policy terms, TakeCare's decision on the Plaintiff's request for reconsideration was due no later than December 22, 2006. In a letter dated December 22, 2006, TakeCare scheduled a second level review hearing for January 12, 2007. However, the letter was not mailed until December 28, 2006. *Id.*, Exh. I.

The review hearing proceeded on January 12, 2007. Plaintiff presented her case through counsel. On January 30, 2007, the Plaintiff received a letter dated January 25, 2007, the second Level Review Committee conveyed its finding upholding the finding of the earliest review, indicating, *inter alia*:

> Your twins, [names deleted], were born prematurely in December 2005, and were immediately diagnosed with among other things, respiratory distress syndrome requiring inpatient treatment at Guam Memorial Hospital for several months. Respiratory distress syndrome is a complication of premature birth and as such triggers the plan limitations for complications of infancy.

*See* Docket No. 41, Pocaigue Decl., Exh. J.

M.T.H.S. was diagnosed as suffering from "congenital sensorineural hearing loss." *Id.*, Exh. M [7/30/08 medical record]. The GMH discharge reports for the twins indicate that they suffered from "Respiratory Distress Syndrome ("RDS")." *Id.*, Exhs. K and L.

The Plaintiff has not paid any of the medical bills denied by TakeCare after the limitation had been exceeded; and she has not borrowed any money to pay such bills or encountered adverse credit consequences due to the obligations. *See* Docket No. 40, Hinkle Tr., pp. 99-100. Thus, as of now, Plaintiff has not suffered any out-of-pocket "damages" based on the Plan Limitations. *Id.*

## II. JURISDICTION AND VENUE

Under 29 U.S.C. § 1132(e)(1), federal courts are provided jurisdiction over claims to recover benefits under the terms of an Employee Retirement Income Security Act ("ERISA") plan[1]. *See* 29 U.S.C. § 1132(e)(1). "[D]istrict courts of the United States shall have exclusive

---

[1] On January 5, 2009, TakeCare removed this case from the Superior Court of Guam.

jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary, or any person referred to in section 1021(f)(1) of this title."

Venue is proper in this judicial district, the District of Guam, because the Plaintiff lives here, and because all of the events or omissions giving rise to Plaintiff's claims occurred here. *See* 28 U.S.C. § 1391.

### III. APPLICABLE STANDARD FOR MOTION FOR SUMMARY JUDGMENT

**A. General Summary Judgment Standard.**

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. A "principal purpos[e] of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327 (quoting Fed. R. Civ. P. 1).

To prevail on a summary judgment motion, the moving party must persuade the court that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

All doubts should be resolved in favor of the non-moving party. *See MetroPCS, Inc. v. City and County of San Francisco*, 400 F.3d 715, 720 (9th Cir. 2005). However, that party cannot create a "genuine" issue of "material" fact simply by making assertions in its legal memoranda. *See S.A. Empresa De Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1980). "[R]ather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

In assessing a summary judgment motion, "[t]he Court is not obligated to consider

matters not specifically brought to its attention." *Katherine G. ex rel. Cynthia G. v. Kentfield Sch. Dist.*, 261 F. Supp. 2d 1159, 1167 (N.D. Cal. 2003). Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

**B. Summary Judgment in an ERISA Case.**

In a case governed by ERISA, a summary judgment motion is the vehicle for the trial court to review the propriety of the benefit decision. *Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1192 n.3 (9th Cir. 2007).

Determining the appropriate standard of review begins with the general rule that a benefits decision governed by ERISA is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Jebian v. Hewlett-Packard Co. Employee Benefits Organiz. Income Protection Plan*, 349 F.3d 1098, 1102 (9th Cir.2003). When interpreting ERISA decisions, "the default is that the administrator has no discretion, and the administrator has to show that the plan gives it discretionary authority in order to get any judicial deference to its decision." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir. 1999).

If the plan administrator is granted such discretionary authority, a reviewing court must apply an abuse of discretion standard. *Firestone*, 489 U.S. at 115. In this instance, it appears that a *de novo* review is in order. Moreover, TakeCare invites the court to apply a *de novo* review of the central coverage question presented. Docket No. 53, Reply, p. 10.

**IV. ANALYSIS**

As noted, Plaintiff has pleaded a cause of action under ERISA to "enforce" rights under TakeCare's insurance Plan pursuant to 29 U.S.C. § 1132(a)(1)(B). Section 1132(a)(1)(B) states, "[a] civil action may be brought-(1) by a participant or beneficiary- to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

TakeCare seeks summary judgment on the ground that it did not deny coverage. The resolution of TakeCare's motion depends upon this court's interpretation of the Plan Limitation clause and, whether TakeCare may rely upon the coverage cap of $50,000 per member, as set forth in the "Plan Limitations" section of the applicable "Schedule of Benefits." *See* Docket No. 41, Decl. Pocaigue, Exh. B, p. 2. TakeCare argues that the issue is not over whether the twins were "covered" or whether coverage was "denied," but rather how much coverage is afforded under the policy. *See* Docket No. 39.

Under Guam law, construction of a contract, where material facts are undisputed, is a question of law for the court. "The interpretation of an insurance policy, as applied to undisputed facts, is a question of law." *National Union Fire Ins. Co. v. Guam Hous. & Urban Renewal Auth.*, 2003 Guam 19, ¶ 13 (adopting and quoting *Cort v. St. Paul Fire & Marine Ins. Co.*, 311 F.3d 979, 982 (9th Cir. 2002)). "A court's interpretation of the terms and coverage of an insurance policy is a question of law and therefore appropriately resolved on summary judgment." *Id.* (quoting *Brown & Lacounte, LLP v. Westport Ins. Corp.*, 307 F.3d 660, 662 (7th Cir. 2002)).

> When faced with questions of insurance policy interpretation under ERISA, federal courts apply federal common law. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S.Ct. 948 (1989); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 98, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (holding that federal common law of ERISA preempts state law in the interpretation of ERISA benefit plans). Under the federal common law of ERISA, we "interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience." *Babikian v. Paul Revere Life Ins. Co.*, 63 F.3d 837, 840 (9th Cir.1995) (internal quotations and citation omitted). As we develop federal common law to govern ERISA suits, we may "borrow from state law where appropriate, and [be] guided by the policies expressed in ERISA and other federal labor laws." *Id.* (internal quotations and citation omitted).

*Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir. 2002).

As noted, the Ninth Circuit has directed courts to borrow "from state law where appropriate, and [be] guided by the policies expressed in ERISA and other federal labor laws." *Babikian v. Paul Revere Life Ins. Co.,* 63 F.3d 837, 840 (9th Cir. 1995) (citation omitted). In this case, Guam's insurance statutes are adopted from California. *Fajardo v. Liberty House Guam*, 2000 Guam 4 ¶ 15. For this reason, the court considers California case law for guidance.

"Generally, when a legislature adopts a statute which is identical or similar to one in effect in another jurisdiction, it is presumed that the adopting jurisdiction applies the construction placed on the statute by the originating jurisdiction." *Sumitomo Constr., Co. v. Zhong Ye, Inc.*, 1997 Guam 8 ¶ 7 (citing Sutherland's Stat. Const. § 52.01 (5th Ed)). "[W]e look to the substantial precedent developed within that state to assist in interpreting parallel Guam provisions." *Torres v. Torres*, 2005 Guam 22 ¶ 33 (quoting *People v. Superior Court* (*Laxamona*), 2001 Guam 26 ¶ 8); *see also O'Mara v. Hechanova*, 2001 Guam 13 ¶ 8 n.1 (observing that where a Guam provision is derived from "California, California case law on this issue is persuasive when there is no compelling reason to deviate from California's interpretation.") (*citing Fajardo*, 2000 Guam 4 ¶ 17).

**A. Whether the Plan Limitation Clause is Ambiguous.**

**1. The Failure to Define a Term Does not Make it Ambiguous.**

The Plaintiff alleges that TakeCare erroneously interpreted the Plan provisions and that the terms "complication of infancy/Congential Abnormalities" are ambiguous because they were not defined in the policy.[2] However, "[t]he absence from the policy of a definition of [a] term . . . does not by itself render the term ambiguous . . . Indeed, any rule that rigidly presumed ambiguity from the absence of a definition would be illogical and unworkable." *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co*. 855 P.2d 1263, 1270 (Cal. 1993) (citations omitted).

> To avoid the ambiguity perceived by the Court of Appeal, an insurer would have to define every word in its policy, the defining words would themselves then have to be defined, their defining words would have to be defined, and the process would continue to replicate itself until the result became so cumbersome as to create impenetrable ambiguity.

*Id.*

Of course, "[u]nder some circumstances, the absence of a definition could be a factor to

---

[2] As previously discussed, the Plan Limitation clause had an (*) noted next to it which stated that the participant should refer to the Member Handbook and Provider directory for a more thorough description or explanation of covered benefits. After reviewing the documents, neither document has any description or explanation of the clause.

consider in determining whether a term is ambiguous; for example, where the words in question do not have a generally accepted meaning or where a technical term is used." *Blasiar, Inc. v. Fireman's Fund Ins. Co.*, 755, 90 Cal. Rptr. 2d 374, 378 (Ct. App. 1999). Here, however, the terms in question, are generally understandable terms that are non-technical. "[L]anguage in a contract must be interpreted as a whole, and in circumstances of the case, and cannot be found to be ambiguous in the abstract." *Id.*

Moreover, while the Member Handbook lacks definitions relevant to these matters, it expressly contains the following admonition:

> Please refer to your "Schedule of Benefits" for a summary listing of benefit coverage, co-payments, co-insurance, deductibles, exclusions and limitations specific to your health plan.
>
> If you need assistance, please contact our Customer Service Department on Guam. . . .

Docket No. 41, Pocaigue Decl, Exh. C., p.1.

This language informs the participant reading the Member Handbook that he or she should look to the Schedule of Benefits regarding limitations specific to the Health Plan. In light of this language it is reasonable to assume that the limitations of the policy would be found in the Schedule of Benefits and that all parts of the policy should be construed together. *See Shakey's Inc. v. Covalt*, 704 F.2d 426, 434 (9th Cir. 1983) (In construing the language of a contract, "[a] written contract must be read as a whole and every part interpreted with reference to the whole.").

**2. The Reasonable Expectation Standard.**

"When interpreting an insurance policy, the intent of the parties and the reasonable expectations of the insured are considered. The best evidence of the intent of the parties is the policy language." *Continental Casualty Co. v. City of Richmond*, 763 F.2d 1076, 1079-80 (9th Cir. 1985) (citations omitted). The Plaintiff urges the court to apply the *Ponder* standard, which states:

> [C]ases interpreting insurance contracts designed for the general public neither make nor require a specific finding the agreement constituted an "adhesion contract." (See, e.g., *Crane v. State Farm Fire and Cas. Co.* (1971) 5 Cal.3d 112, 95 Cal.Rptr. 513, 485 P.2d 1129; *Stewart v. Estate of Bohnert*, supra, 101

> Cal.App.3d 978, 162 Cal.Rptr. 126; *Miller v. Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 161 Cal.Rptr. 322.) Without bothering to make that finding, the courts apply the special rules of interpretation ordinarily reserved for adhesion contracts. They scrutinize the provisions of these standardized insurance agreements to insure any exclusions or limitations on coverage meet the twin tests of being "conspicuous" and "plain and clear." (*Crane v. State Farm Fire and Cas. Co., supra*, 5 Cal.3d at p. 115, 95 Cal.Rptr. 513, 485 P.2d 1129 ["An exclusionary clause must be conspicuous, plain and clear."]; *Stewart v. Estate of Bohnert, supra*, 101 Cal.App.3d 978, 988, 162 Cal.Rptr. 126; *Miller v. Elite Ins. Co., supra*, 100 Cal.App.3d 739, 751, 161 Cal.Rptr. 322.)

*Ponder v. Blue Cross of Southern California*, 193 Cal.Rptr. 632, 637 (1983).

In interpreting an insurance contract, the Ninth Circuit specifically adopted California's doctrine of reasonable expectation as set forth in *Ponder,* particularly that coverage exclusions must be conspicuous, plain and clear. *Saltarelli v. Bob Barker Group Medical Trust*, 35 F.3d 382, 387 (9th Cir. 1994). The Ninth Circuit explained:

> [A]n insurer wishing to avoid liability on a policy purporting to give general or comprehensive coverage must make exclusionary clauses conspicuous, plain, and clear, placing them in such a fashion as to make obvious their relationship to other policy terms, and must bring such provisions to the attention of the insured.

*Saltarelli,* 35 F.3d at 386 (quoting *Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc.,* 356 S.E.2d 488, 496 (W. Va. 1987)).

In *Saltarelli*, a group health plan denied liability to a claimant based on a pre-existing condition exclusion. 35 F.3d 382. Review of the plan at issue revealed that the plan "chose to bury one of the plan's most significant provisions amidst definitions, rather than forthrightly stating the pre-existing conditions exclusion in the operative clauses of the plan description." *Id.* at 385. Therefore, the Ninth Circuit "emphatically agree[d] with the district court finding that the "purported exclusion for pre-existing conditions [was] not conspicuous enough to attract the attention of a reasonable layman." *Id.* at 385.

The reasonable expectation doctrine, which grew out of the law of adhesion contracts and construction of ambiguities in insurance policies, has been described by the Ninth Circuit as follows:

> In general, courts will protect the reasonable expectations of applicants, insureds, and intended beneficiaries regarding the coverage afforded by insurance carriers even though a careful examination of the policy provisions indicates that such expectations are contrary to the expressed intention of the insurer.

*Id.* at 386 (Robert E. Keeton & Alan I. Widiss, *Insurance Law: A Guide to Fundamental Principles, Legal Doctrines, and Commercial Practices* § 6.3 (West 1988)).

Specifically, courts applying this doctrine examine whether any exclusions are "clear, plain, and conspicuous enough to negate [a] layman['s] . . . objectively reasonable expectations of coverage." *Id.* at 387. If not, the exclusion is unenforceable.

TakeCare points out that the higher standard of scrutiny concerning policy exclusions as discussed in *Ponder* and *Saltarelli* is inapplicable because there was no exclusion of coverage. It argues that there is a distinction between a limitation of benefits from that of an exclusion of benefits. Some courts interpreting similar health insurance policies have noted that benefits schedules and other provisions that limit coverage under certain circumstances are not subject to the stricter rules governing coverage exclusions. *See Van Ness v. Blue Cross of California*, 104 Cal. Rptr. 2d 511, 517 (Ct. App. 2001) (holding that "[w]e do not accept Van Ness's characterization that the limited fee schedule operated as an exclusion from coverage. . . . Instead, it fixed the maximum amount Blue Cross would pay for those services when obtained from a nonparticipating provider."); *Gravelle v. Health Net Life Ins. Co.*, No. C 08-04653 MHP, 2009 WL 210450, at *7 (N.D. Cal. Jan. 26, 2009) (slip copy) (holding that the limitation of benefit for out-of-network providers was not a policy exclusion but rather "a more basic and obvious structural component of the plan.").

The facts of the instant case parallel those of *Van Ness* 104 Cal. Rptr. 2d 511. In *Van Ness*, an insured brought suit under California law against an insurer who paid a reduced benefit amount because the insured used on Out-of-Network provider, per the policy's provisions. *Id.* at 512-15. Ignoring the plain language of the policy, the plaintiff allegedly believed "Blue Cross would pay 70 percent and I would pay the rest," based upon a prior experience involving his wife. *Id.* at 514. The court noted that exclusions governing coverage must be "conspicuous, plain, and clear." *Id.* at 516 (*citing Ponder*, 193 Cal.Rptr. at 637). It found, however, that the procedure at issue was not subject to an exclusion analysis because the procedure was in fact covered, albeit at a lower rate when performed by an Out-of-Network provider. *Id.* at 517-18. Since the difference between preferred and out-of-network providers did not constitute an

exclusion, the defendant did not need to meet the *Ponder* test. In any event, the court found the policy "clearly and explicitly" informed the policyholder of the difference, and the court of appeal affirmed the trial court's dismissal of the complaint. *Id.* at 518.

In *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 237 (2d Cir. 2002), the court explained that "limitations or qualifications" should be examined "in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes." *Id.* (citations omitted). "Exclusions from coverage" on the other hand, "must be set forth clearly and unmistakably, not be subject to any other reasonable interpretation, and fit the particular case." *Id.*

Contrary to TakeCare's position, there are also cases suggesting a *Ponder* level of scrutiny is applied when a policy limitation is at issue. *See Blasiar, Inc.,* 90 Cal. Rptr. 2d at 378 ("When a policy limitation is at issue, the language of the limitation must be plain and clear."); *Feurzeig v. Insurance Co. of the West*, 69 Cal. Rptr. 2d 629, 632 (Ct. App. 1997) ("When an insurer wishes to limit coverage the limitation 'must be conspicuous, plain and clear.'") (quoting *Crane v. State Farm Fire & Cas. Co.*, 485 P.2d 1129 (Cal. 1971)).

> Conspicuous placement of exclusionary language is only one of two rigid drafting rules required of insurers to exclude or limit coverage. (4) The language itself must be plain and clear. ( *Ponder v. Blue Cross of Southern California, supra*, 145 Cal.App.3d 709, 723.) "This means more than the traditional requirement that contract terms be 'unambiguous.' Precision is not enough. Understandability is also required. To be effective in this context, the exclusion must be couched in words which are part of the working vocabulary of average lay persons." ( *Ibid.; National Auto. & Casualty Ins. Co. v. Stewart, supra*, 223 Cal.App.3d at p. 458.)

*Jauregui v. Mid-Century Ins. Co.,* 3 Cal.Rptr.2d 21, 24 (Ct. App.1991).

Since there appears to be no firm standard in the Ninth Circuit, the court will apply the higher standard. Under the higher *Ponder* standard, the parties agree that the Plan Limitation clause was conspicuous enough. *See* Docket No. 48, Opposition, p. 8. It was highlighted as one of only two limitations contained in the Schedule of Benefits. They differ though, as to whether the clause was ambiguous and/or unclear.

The Plaintiff contends that the wording of the Plan Limitation clause was ambiguous, uncertain and not clearly defined nor explained. *See* Docket No. 13, First Amended Compl., ¶

40. To further support her position, the Plaintiff enlists the declaration testimony of Dr. Manuel DeCastro ("Dr. DeCastro"). *See* Docket No. 47, Declaration of Manuel DeCastro ("Dr. DeCastro Decl."). Dr. DeCastro concludes that the Plan Limitation clause does not apply because the twins "were not born with any preexisting complications of infancy, birth defects, or congenital abnormalities." Docket No. 47, Dr. DeCastro Decl., ¶ 11. Dr. DeCastro states that the complications the twins suffered were complications of *prematurity* rather than complications of infancy.[3] *Id.* at ¶ 10.

However, Dr. DeCastro's interpretation of the Plan Limitation clause is of little help to the court. The court is charged to read the policy as a layman would read it. *See Miller v. Elite Ins. Co.*, 161 Cal. Rptr. 322, 329 (Ct. App. 1980) (courts should interpret terms of policy "in an ordinary and popular sense as a person of average intelligence and experience would understand them.").

### 3. Standard of Interpretation is an "Ordinary and Popular Sense."

Whether a contract is ambiguous is a question of law for the court. *Airborne Freight Corp. v. McPherson*, 427 F.2d 1283, 1285 (9th Cir. 1970). In determining whether language is ambiguous, the court interprets terms in an ERISA insurance policy

> in an ordinary and popular sense as would a person of average intelligence and experience. We will not artificially create ambiguity where none exists. If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy. Further, we examine the contract as a whole and if, on the face of the contract, two reasonable and fair interpretations are possible, an ambiguity exists. If an ambiguity exists, we must resolve it in favor of the insured.

*Babikian v. Paul Revere Life Ins. Co.*, 63 F.3d 837, 840 (9th Cir. 1995) (internal quotations and citations omitted) (holding that plaintiff had no reasonable expectation that benefits would vest where contrary language was clear, plain, and conspicuous.).

TakeCare argues that, as a matter of law, the Plan Limitation clause is unambiguous and the meaning of the words "infancy" and "complication" are plain. "To be plain and clear the

---

[3] It is hard to understand the distinction made by the doctor. A reasonable person would likely understand that a premature infant suffering from respiratory distress syndrome would also be seen as having a "complications of infancy."

Page 13 of 20

limitation should be precise and understandable." *Feurzeig*, 69 Cal. Rptr. 2d at 632. Infancy is defined as "early childhood, a beginning or early period of existence, the legal status of an infant." Merriam-Webster's Collegiate Dictionary 597 (11th ed. 2003). The term "complications" is defined as "a secondary disease or condition developing in the course of a primary disease or condition." *Id.* at 236; *see Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, 563 F.3d 777, 784 n.4 (9th Cir. 2009) ("[D]ictionary definitions are an appropriate consideration in evaluating the ordinary meaning of terms in an insurance contract.").

TakeCare contends that a condition requiring an infant to spend several weeks in a neo-natal intensive care unit constitutes a "complication of infancy." The court agrees. *See Stanford Ranch, Inc. v. Maryland Cas. Co.*, 89 F.3d 618, 626 (9th Cir. 1996) ("'If the meaning a layperson would ascribe to the contract language is not ambiguous, there is no place for interpretation and the court must simply apply that meaning.'") (quoting *Chatton v. Nat'l Union Fire Ins. Co.*, 13 Cal.Rptr.2d 318, 322 (Ct. App. 1992). It is clear that RDS is commonly considered a "complication" of infancy. This is confirmed by the literature that "[n]eonatal respiratory distress syndrome is most commonly a complication seen in premature infants." Docket No. 44, Erratum, attachments.[4]

Moreover, there has been judicial recognition that infants born prematurely face enhanced risk of complications of infancy. *Hegyes v. Unjian Enterprises, Inc.*, 286 Cal.Rptr. 85, 113 (Ct. App. 1991) (recognizing that "'[t]he great majority of respiratory infections [in children] occur' in premature infants" and that "there is a corresponding increase in the rate of serious complications in such infants who survive premature birth . . . . ") (quoting 5 Lawyer's Medical Cyclopedia of Personal Injuries and Allied Specialties (3d ed. 1986) § 37.24b, p. 106); *Miller ex rel. Miller v. HCA, Inc.*, 118 S.W.3d 758, 763 (Tex. 2003) (case wherein a 23-week-old infant survived the birth, but a few days afterward, "suffered a brain hemorrhage – a complication not uncommon in infants born so prematurely."); *see also Tobin v. Astra Pharm.*

---

[4] *Neonatal Respiratory Distress Syndrome*, Medline Plus (U.S. Nat. Library of Medicine/National Institutes of Health); *Respiratory Distress Syndrome RDS in Infants Overview,* New York Times. com, *Health Guide.* Docket No. 44, attachments thereto.

*Prods*, 993 F.2d 528, 540 n.9 (6th Cir. 1993) ("The problems associated with preterm delivery are numerous: low birth weight, birth defects, respiratory distress syndrome, high infant morbidity and mortality, etc.").[5]

The Plaintiff contends that the Plan was ambiguous because one provision of the Plan stated that TakeCare would pay "100% of eligible charges" for "newborn care," while the "Plan Limitation" provision capped coverage at $50,000 per member per year for an infant suffering complications. At the hearing, Plaintiff's counsel argued at length that a "newborn" and an "infant" are not interchangeable and a newborn baby retains the status of "newborn" until discharged from the hospital. He asserted that once discharged, the newborn becomes an infant. Since the twins received neonatal care before being discharged, they never lost their status of being "newborns." Therefore, he contends that the policy language providing 100% of coverage for "newborns" should apply. *See* Docket No. 41, Pocaigue Decl., Exh. B.

Unfortunately, no reasonable person could believe that a newborn is not also an infant, and further believe that the date of discharge from the hospital is the controlling factor as to when a newborn becomes an infant. *See Shakey's Inc.*, 704 F.2d at 434 ("Preference must be given to reasonable interpretations as opposed to those that are unreasonable, or that would make the contract illusory."); *see also Int'l Union of Bricklayers & Allied Craftsman Local No. 20 v. Martin Jaska Inc.*, 752 F.2d 1401, 1406 (9th Cir. 1985) ("The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous."). There is no authority or support for the Plaintiff's untenable position. Simply put, the court would have to strain to find that the terms "infancy complication" does not apply to a premature newborn diagnosed with RDS. This court will not entertain such a strained interpretation. *See e.g. , Peterson v. American Life & Health Ins. Co.*, 48 F.3d 404, 411 (9th Cir. 1995) ("We have no doubt that the term

---

[5] TakeCare also argues that the term "congenital abnormality" is also not ambiguous. The term "congenital" is defined as "existing at or dating from birth." *Merriam Webster's Collegiate Dictionary,* 243 (10th ed. 1997). However, the court finds the term "abnormality" ambiguous. It is not entirely clear that RDS is an abnormality. In addition, when one thinks of congenital abnormalities, one may think more of conditions such as cleft palate, spina bifida or congenital heart disease. Accordingly, the court does not find this clause plain and clear.

'bypass surgery' encompasses coronary bypass surgery; it stretches the imagination to suggest that a reasonable person would understand the term to include only gastric bypass to control morbid obesity.").

After determining whether the Plan Limitation clause is ambiguous in an ordinary and popular sense as would a person of average intelligence and experience, the court finds that the clause is conspicuous, plain and clear, as a matter of law. *See Babikian*, 63 F.3d at 840.[6]

**B. TakeCare is not Estopped from Denying Benefits.**

The Plaintiff also seeks actual and consequential damages for breach of contract, based upon the doctrine of equitable estoppel alleging that TakeCare should be estopped from denying full coverage for the twins. Specifically, the Plaintiff claims that, as a result of oral misrepresentations made by, or on behalf of, TakeCare, she believed that the twins would be "fully covered" and that TakeCare would pay for all the medical bills. The Plaintiff alleges that because she was told the twins were "fully covered" she reasonably relied on such material representation so as not to obtain any additional and/or applicable health coverage for the twins.

> An ERISA beneficiary may recover benefits under an equitable estoppel theory upon establishing a material misrepresentation, reasonable and detrimental reliance upon the representation and extraordinary circumstances. *In Re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation*, 58 F.3d 896, 907 (3rd Cir.1995). The Ninth Circuit has imposed two additional prerequisites on a plaintiff attempting to allege a claim of equitable estoppel in an ERISA action. First, the provisions of the plan at issue must be ambiguous such that reasonable persons could disagree as to their meaning or effect. *Greany v. Western Farm Bureau Life Ins. Co.*, 973 F.2d 812, 821 (9th Cir.1992). Second, representations must be made to the employee involving an oral interpretation of the plan. *Id.* "Unless both conditions are met ... a beneficiary has no equitable estoppel claim." *Greany, supra* at p. 821-822, quoting *Simmons v. Southern Bell Tel. and Tel. Co.*, 940 F.2d 614, 618 (11th Cir.1991).

*Pisciotta v. Teledyne Indus., Inc.*, 91 F.3d 1326, 1331 (9th Cir. 1996).

The Plaintiff is unable to satisfy the first condition of the test set out in *Greany*, 973 F.2d at 821. The evidence submitted in this case establishes that the Plan, which was administered by

---

[6] The court also notes that the insurance industry recognizes that premature infants present extraordinary actuarial risks. *See e.g.*, *St. Mary Med. Ctr. v. Cristiano*, 724 F. Supp. 732, 734-735 (C.D. Cal. 1989) (noting that insurer Hartford Insurance Co. had declined to cover the child on the grounds that her premature birth had "created an unacceptable risk under its underwriting guidelines.").

TakeCare, was not ambiguous and clearly limited Plaintiff's coverage. The Plan Limitation clause provided that no coverage beyond $50,000 per member per year for infants suffering complications. *See* Docket No. 41, Pocaigue Decl., Exh. B, p. 2. Plaintiff's equitable estoppel argument seeks a determination that she is entitled to 100% coverage under the Plan for each twin's medical costs. However, the words "fully covered" should not be construed to mean *unlimited* coverage without regard to limitations, exclusions, co-pay requirements, out-of-area limitations or other policy provisions. Such a determination would enlarge her rights beyond what is allowed under the language of the Plan. "A plaintiff cannot avail himself of a federal ERISA estoppel claim based upon statements of a plan employee which would enlarge his rights against the plan beyond what he could recover under the unambiguous language of the plan itself." *Greany*, 973 F.2d at 822.

Moreover, ERISA does not permit the oral modification of substantive provisions of a written ERISA plan. *Doe v. Blue Cross & Blue Shield United*, 112 F.3d 869, 875-76 (7th Cir. 1997); *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 650 (7th Cir.1993). In other words, if the written terms of an ERISA plan do not entitle the claimant to the coverage sought, benefits will not be forthcoming on the basis of oral representations to the contrary. *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 986 (9th Cir. 1997) (stating that "courts have held that oral agreements or modifications cannot be used to contradict or supersede the written terms of an ERISA plan."); *see also Pohl v. Nat'l Benefits Consultants, Inc.*, 956 F.2d 126, 128 (7th Cir. 1992).

It is well settled that an ERISA plan cannot be required to pay benefits not provided by the written plan based on equitable estoppel theory. In *Thurber v. Western Conference of Teamsters Pension. Plan*, 542 F.2d 1106 (9th Cir. 1988), the Ninth Circuit held that a benefit plan could not be equitably estopped from denying benefits if payment would be inconsistent with the written plan. The *Thurber* benefits plan required fifteen years of "unbroken service" for retirement. *Id.* at 1107 n.2. Thurber suffered a break in service. The plan administrator advised him that he could "heal" the break by paying contributions retroactively, which he did. *Id.* Thurber's claim for benefits was subsequently denied because he did not meet the plan's written

requirement for unbroken service. *Id.* at 1109. The court held that the law did not allow recovery on the basis of estoppel in the face of contrary, written plan provisions. *Id.*

Similarly here, the representation of a TakeCare employee that the Plaintiff was "fully covered" should not be the grounds to permit the recovery of benefits where the Plan Limitation clause expressly provides otherwise. Accordingly, the court grants TakeCare summary judgment as to the Plaintiff's cause of action for estoppel.

### C. Plaintiff's allegations of mishandling the claims are immaterial.

Plaintiff claims TakeCare mishandled her claims at the administrative level. For example, she alleges that TakeCare "erroneously interpreted plan provisions in . . . denying Plaintiffs the benefits owed for such medical costs and expenses incurred by Plaintiffs' minor children's care." Docket No. 13, First Amended Compl., ¶ 39. Likewise, Plaintiff alleges that TakeCare's actions were "arbitrary, capricious, not made in good faith, [and] unsupported by substantial evidence" (¶ 43); "failed to consider evidence offered by the Plaintiffs" (¶ 40); failed to provide a "full and fair review of their claims" (¶ 42); and violated ERISA Sections 1021 and 1022 "when the defendant failed to give the Plaintiffs specific reasons for denial of the claim" (¶ 47).

TakeCare argues that these claims are immaterial if TakeCare is correct on the coverage question. This is so because clear procedural irregularities are not actionable unless they "affected Plaintiff's substantive rights." *See Martinez v. Beverly Hills Hotel*, 695 F. Supp. 2d 1085, 1107 (C.D. Cal. 2010). "While these procedural irregularities were widespread, they did not prejudice Plaintiff in her attempt to obtain benefits." *Id.* And even if, *arguendo*, there were irregularities, they do not confer coverage by estoppel but instead only affect what level of review the court should apply to the Plan administrator's decision. *See Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110 (9th Cir. 1999) (concluding that *de novo* review was warranted where "procedural irregularities in the initial claims process and an unfair appeal process" tainted plan administrator's benefits decision); *Martinez*, 695 F. Supp. at 1107 ("The Plan did not engage in a 'wholesale and flagrant' violation of ERISA procedures such that the Court should exercise *de novo* review of the Plan's decision."); *Brightway Adolescent Hosp. v. Strachan, Green, Miller &*

*Olender,* No. 2:99CV228K, 2000 WL 33363258, *8 (D. Utah Dec. 15, 2000) (unreported) ("Plaintiffs have failed to cite any cases in which benefits were awarded by the court based on the ground that the plan denied full and fair review.").

The Plaintiff also alleges that TakeCare failed to follow its own deadlines. *See* Docket No. 13, First Amended Compl., ¶ 31. However, these allegations are immaterial as a matter of law. First, only substantial compliance with ERISA's review provisions are required. *See Gravelle*, 2009 WL 210450, at * 8 ("'substantial compliance'" by defendant with these provisions is sufficient."); *Wenner v. Sunlife Assur. Co.*, 482 F.3d 878, 882 (6th Cir. 2007) (holding that "[i]f the communications between the administrator and participant as a whole fulfill the twin purposes of § 1133[7], the administrator's decision will be upheld even where the "'particular communication does not meet those requirements.'") (quoting *Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416, 436 (6th Cir. 2006) ).

Second, ERISA sets forth a time limit of 60 days for responses to an appeal of a coverage decision (45 days for disability determinations). Thus, TakeCare's failure to respond within its self-imposed deadline of 30 days is immaterial. *See* 29 CFR 2560.503-1(i)(1)(i).[8]

Third, as with the other allegations of irregularities, even if it could be said, *arguendo*, that TakeCare missed a deadline by a few days, the result is not that Plaintiff wins her coverage

---

[7] 29 U.S.C. § 1133 provides:
> In accordance with regulations of the Secretary, every employee benefit plan shall--
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

[8] 29 CFR 2560.503-1 (i)(1)(i) provides in pertinent part that "the plan administrator shall notify a claimant in accordance with paragraph (j) of this section of the plan's benefit determination on review within a reasonable period of time, but not later than 60 days after receipt of the claimant's request for review by the plan . . . ."

dispute, but rather that she would be deemed to have exhausted her administrative remedies under ERISA and may proceed to exercise her remedies to seek further recourse under § 502(a) of ERISA. *See Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 981 n.1 (9th Cir. 2005) (noting that the current ERISA standard is that "if plan administrators fail 'to establish or follow claims procedures consistent with [the new regulation], a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies . . . .'") (quoting 29 C.F.R. § 2560.503-1).

## V. CONCLUSION

Again, when deciding a motion for summary judgment, the moving party must persuade the court that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. *Anderson*, 477 U.S. at 248. Based upon the foregoing, it seems clear that TakeCare's position that premature infants suffering from RDS is itself a "complication of infancy" is correct. *See* Docket No. 41, Pocaigue Decl., Exh. B, p. 2. After applying summary judgment standards the court rules in favor of TakeCare as to the coverage issue, and finds that the other matters are immaterial. Accordingly, TakeCare's motion is hereby **GRANTED**.[9]

**SO ORDERED.**



/s/ Frances M. Tydingco-Gatewood
　Chief Judge
Dated: Dec 13, 2010

---

[9] The court notes that it was presented with the proverbial "hard case," that is, a case in which one's natural sympathies are aroused by the Plaintiff's plight. But, however understandable it may be to feel for the Plaintiff under the circumstances, cases cannot be decided by such considerations. Despite the facts of the case, the court is ever mindful of its charge to follow the law. As Justice Jackson acknowledged: "We agree that this is a hard case, but we cannot agree that it should be allowed to make bad law." *FCC v. WOKO, Inc.*, 329 U.S. 223, 229 (1946).